PETERSON et ux. v. CITY OF HOUSTON
et al. (No. 583.)

(Court of Civil Appeals of Texas. Beaumont.
July 6, 1920. Rehearing Denied.
Oct. 13, 1920.)

1. Municipal corporations ⊚⇒817(1)—Burden
of proof as to proximate cause on plaintiffs
suing for injury on street.

The burden of proof of negligence as proximate cause of injury on street sued for against city and its street repair contractor rests on plaintiffs.

2. Municipal corporations ⊚⇒821(19)—Evidence as to negligence of city and street repair contractor insufficient to take case to jury.

In an action against city and its street repair contractor for injuries to a woman who stepped into a hole or sink over an old catch-basin, evidence that the contractor's failure to plug a pipe might have been the cause of the sink *held* insufficient to take the case to the jury.

3. Municipal corporations ⊚⇒800(1)—Negligence in failing to plug pipe under catch-basin not proximate cause of injury to pedestrian.

Negligence of defendant city through its contractor for street repair in failing to plug a pipe causing a sinking or depression at the top of an abandoned catch-basin *held* not the proximate cause of injury to a female pedestrian who stepped there and fell to her injury.

4. Appeal and error ⊚⇒1061(4)—Discharge of jury and judgment harmless error where instructed verdict proper.

That the trial court on defendant's motion discharged the jury and rendered judgment for defendants without verdict was merely equivalent to instruction of verdict for defendants, which would have been proper, so that no error prejudicial to plaintiffs was committed.

Appeal from District Court, Harris County; J. E. Harvey, Judge.

Suit by J. B. Peterson and wife against the City of Houston and others. Judgment for defendants, and plaintiffs appeal. Affirmed.

Samuel Schwartz, of Houston, for appellants.

W. J. Howard, J. Y. Powell, and Hunt & Teagle, all of Houston, for appellees.

HIGHTOWER, C. J. This suit was filed by J. B. Peterson and his wife, Adelina Peterson, in the district court of Harris county, against the city of Houston and Eureka Paving Company, the plaintiffs alleging in their petition that on or about the 2d day of March, 1918, Mrs. Peterson, in consequence of negligence on the part of said defendants, stepped into a hole or excavation that was in the parking in close proximity to the sidewalk on Louisiana street in the city of Houston, near the corner of that street and Bell avenue, and that, as a result of stepping or falling into said hole or excavation, Mrs. Peterson sustained permanent and serious personal injuries specified in the petition, and plaintiffs claim damages therefor in the sum of $25,000.

In order that the points at issue may be clearly understood, we first make the following general statement of the facts relied upon by plaintiffs for recovery:

In April, 1914, the city of Houston entered into a written contract with the Eureka Paving Company, a corporation engaged in the business of paving streets, etc., by the terms of which the Eureka Paving Company was engaged by the city of Houston to pave Louisiana street between Pease and Dallas avenues in that city. The work was to be performed by the Eureka Paving Company according to certain plans and specifications agreed upon by the parties, and under the supervision and direction of the city engineer of the city of Houston. The work to be performed under the contract was completed some time near the latter part of October, 1918, and on the 26th day of that month the work as done by the Eureka Paving Company was formally accepted by the city council of the city of Houston, upon the recommendation of its engineer. As a part of the work performed under this contract, the Eureka Paving Company installed or put in a catch-basin on the left side of Louisiana street, where the same was intersected by Bell avenue; in other words, this catch-basin was put in at the corner of Louisiana street and Bell avenue on the west side of Louisiana street. At the time this contract was entered into by said city and Eureka Paving Company, there was already at the corner of Louisiana street and Bell avenue an old catch-basin, but it became proper and necessary, in the proper performance of the contract by the Eureka Paving Company, to put in the new catch-basin at this point, and it was installed or put in at a distance of between six and eight feet from the old catch-basin. The presence of the new catch-basin dispensed with the necessity for the old one, and rendered it of no further use, and it was proper to abandon it as a catch-basin. In completing the new catch-basin, the Eureka Paving Company, with the consent, or at least with the acquiescence, of said city, removed the top of the old catch-basin, which was constructed of cast iron, and used the same as a top or cover for the new catch-basin, and, having removed the top from the old catch-basin, the same was left exposed, and it became necessary and proper to fill up the same, in order that persons using the sidewalk at that point might do so without danger of stepping into such exposed hole and be injured. The gra-

vamen of the complaint of the plaintiffs was that in filling up or refilling this old catch-basin the Eureka Paving Company was guilty of negligence which became and was the proximate cause of Mrs. Peterson's injuries, and that, as such work was done by the Eureka Paving Company as contractor, under the direction and supervision of said city, acting by and through its engineer, whose duty it was to see that such work was properly done, the city became also liable for the injury sustained by Mrs. Peterson. As showing the claimed negligence on the part of the defendants, we quote the following from the plaintiffs' petition:

"Plaintiffs further allege and would show that they do not know of their own knowledge how said work was performed, but they allege, upon information and belief, that in the performance of said contract hereinabove alleged, as designed, ordered, directed, caused, and accepted by the defendant city of Houston, the defendant Eureka Paving Company, its agents, servants, and employés, carelessly, and negligently failed (a) to properly and skillfully plug and fill up the discharge pipe or conduit leading from said abandoned excavation or catch-basin, (b) to properly and skillfully fill in and cover up said excavation and catch-basin, in that it so failed and neglected to use proper materials or skilled labor and workmen, and (c) so failed and neglected to fill up, tamp, pack, and ram down tight the earth or other materials with which said excavation and catch-basin was then and there filled and covered up, and that by reason of such carelessness and negligence aforesaid, in either one or all of the particulars alleged, and as the direct and proximate result thereof, said sidewalk, parking, and way at, in and about the place hereinabove described was made, constructed, rendered, and left in a faulty and defective condition, and by reason of which the earth under said sidewalk, parking, and way and adjacent thereto gradually sank, subsided, and settled down, thereby causing one portion of said way, sidewalk, and parking to be raised several inches higher than the adjoining portion thereof, and forming a very defective condition in the nature of a hole or depression in the said parking next to the sidewalk and between said walk and the curbing on the west side of said Louisiana street at the point hereinabove described, and which hole or depression was from 12 to 14 inches in width by 1 to 1½ feet in depth, being hollowed out beneath the surface or crust of the earth so as to make it very dangerous for pedestrians walking in, upon, and along said street, way, sidewalk, and parking, and especially to persons using said sidewalk and parking to cross from the north side of Bell avenue to the south side thereof, the said hole, defect, and depression having a tendency, by reason of its being hollowed out beneath the surface of the earth, to trip one who should step therein and throw them on said sidewalk.

"If plaintiff be mistaken as to the manner in which said defect was caused, then they allege that the said work and improvements and the necessary and incidental changes, alterations, and repairs so designed, ordered, directed, caused, and supervised by the defendant city of Houston, and then and there performed, made, installed, and done by the defendant Eureka Paving Company, acting by and through its agents, servants and employés, was carelessly, negligently, unskillfully, and improperly performed, made, installed, done, and left, and by reason of such carelessness or negligence in the performance of said work in the installation of said improvements and the making of said necessary and incidental changes, alterations, and repairs improperly and unskillfully the said street, way, sidewalk, and parking at, in, and about the place hereinabove described was made, constructed, rendered, and left in a faulty and defective condition, so that it would and did naturally and as the direct and proximate result of said negligent, improper, unskillful work and faulty and defective condition became unsafe and dangerous to the life and limbs of persons who might have occasion to use the same for travel, as hereinabove particularly described.

"That the defendants and each of them well knew that the aforesaid faulty and defective condition of said way, sidewalk, and parking existed or would likely and naturally occur as a result of the aforesaid carelessness and negligence of said defendants, or, if they did not actually know it, then they and each of them should and could by the use of such ordinary and reasonable care and diligence as they and each of them were in duty bound to exercise have so ascertained such facts and avoided the same.

"That the plaintiff Adelina Peterson was injured and plaintiffs were damaged as hereinafter alleged as a direct and proximate result of the aforesaid carelessness and negligence of said defendants and each of them."

The defendants filed separate answers, each pleading a general demurrer and general denial, and also contributory negligence on the part of Mrs. Peterson. The city of Houston, both by way of special exception and special answer, further pleaded in bar of the suit section 12, art. 9, of its charter, alleging that the injury received by Mrs. Peterson, if any, was caused by one of the streets of said city being out of repair, and that no special notice in writing had been given to the mayor or city council of the condition of such street 10 days prior to such injury, as provided in said section and article of its charter. The defendant city of Houston also further pleaded by way of cross-action against its codefendant, Eureka Paving Company, and also impleaded the United States Fidelity & Guaranty Company as surety on the bond of the Eureka Paving Company for the faithful performance of that company's contract with the city. These matters are not material here, and will not be further noticed.

The defendant Eureka Paving Company specially denied that it was guilty of any negligence as alleged by the plaintiffs, but that, if it were guilty of any such alleged negligence, the same was not the proximate cause of Mrs. Peterson's injuries.

A jury was selected and impaneled, but upon conclusion of the evidence the trial court sustained a motion presented by defendants requesting the court to take the case from the jury and enter judgment in favor of defendants, which was done over the protest of plaintiffs, and they duly excepted to the court's action.

We find in appellants' brief nine assignments of error, which are grouped and submitted together, and they all relate practically to the same point, and complain of the action of the trial court in refusing to submit the case to the jury, and in discharging the jury and rendering judgment in favor of defendants.

The substance of the propositions advanced under these assignments is: (1) That the evidence introduced upon the trial was sufficient to authorize a finding by the jury that the Eureka Paving Company was guilty of negligence in the manner in which it filled up or refilled the old catch-basin hereinabove mentioned, and that such negligence was the proximate cause of Mrs. Peterson's injury, and that, since the work in that connection done by the Eureka Paving Company was under the direction and control of the defendant city of Houston, such negligence was attributable to that defendant; (2) there being evidence sufficient to warrant a finding of negligence, or at least to raise the issue, and the jury having been demanded and impaneled to try the issue, the trial court committed reversible error in taking the case from the jury and rendering a judgment without the verdict of the jury in favor of the defendants; and (3) that the action of the court in sustaining defendants' motion was in effect to sustain a demurrer to the evidence, and that such demurrer was erroneously sustained, and that, since the only question for determination is what amount of damages plaintiffs should recover, this court should reverse the judgment of the trial court and remand the cause, with instructions to that court to impanel a jury for the purpose only of ascertaining the amount of damages to which the plaintiffs might be entitled.

In each of these propositions it is assumed that the evidence adduced upon the trial was sufficient to require the submission to the jury of the grounds of negligence as pleaded by the plaintiffs, and for their determination also the issue as to whether such negligence became the proximate cause of Mrs. Peterson's injuries.

The evidence was sufficient to show that Mrs. Peterson and her married daughter, Mrs. Gorman, about 7:30 o'clock p. m. on March 2, 1918, were walking along the sidewalk on the west side of Louisiana street in the city of Houston, going south, and that Mrs. Peterson, who was walking in the space between the curb of the street and the sidewalk proper, which space is called the parking, stepped into a hole or excavation which was only a few inches distant from the sidewalk proper, and that she fell to the ground, her head striking a rock or some other hard substance, and she was substantially and perhaps seriously injured in consequence of stepping into such hole. There is testimony sufficient to show that this hole was something like 18 inches deep and 20 inches in diameter, and that it was partially obscured perhaps by weeds or grass growing there. The evidence is conclusive on the point that this hole into which Mrs. Peterson stepped was where the old catch-basin above mentioned was before it was filled in by the Eureka Paving Company. There was no evidence showing how long this hole or excavation had been there, but the testimony of one witness was substantially to the effect that he had noticed the hole some two, three, four, or five months prior to that time. There was no testimony in support of the plea of contributory negligence on the part of defendants.

In view of the nature of the assignments of error under consideration, (it becomes necessary to show substantially what the evidence was bearing upon the issues of negligence as pleaded by the plaintiffs. This evidence comes almost exclusively from the witness E. E. Sands, who was introduced by the plaintiffs, and from the witness J. A. Handy, who was introduced by the defendant Eureka Paving Company. It was shown by the witness Sands that he was the city engineer of the city of Houston at the time the Eureka Paving Company did the work for the city, including the filling in or refilling of the old catch-basin above mentioned. He was employed by the city in that capacity in September, 1913. It was shown by him that as city engineer he had charge and direction of all constructions of pavements, sewer work, turning basins, catchbasins, etc., done under contract for the city, that all specifications and plans for such work were prepared by him, and that all such works are supervised and inspected by him, and that after the completion of such works, if in accordance with the plans and specifications, it was his duty to make a certificate to that effect to the contractor, and thereupon the city would accept the work. It was shown by him that he did direct and supervise the paving of Louisiana street under the contract with the Eureka Paving Company mentioned by us above, and that on the 23d day of October, 1914, he issued a certificate in his capacity as city engineer to the effect that the Eureka Paving Company had completed its work under its contract with the city in accordance with the terms thereof. In speaking of a catch-basin he said:

"A catch-basin is a device to collect storm water. The one in that particular location (meaning at the corner of Louisiana street and Bell avenue) was round and probably 3 or 4 feet deep, about 20 or 24 inches in diameter in size. There is an iron plate on the top of them. One side of them is open to admit the storm water. The storm water flows into this basin. From there it is continued to a manhole in the center of the street, where it in turn gets into the storm sewer. That water is continued by means of a petrified clay pipe which is at the bottom of the catch-basin. That manhole that is to go there is walled up with brick or concrete, usually brick. The iron plate is put over it on the ground just to make a top to it to keep people from falling into it. My recollection is that this new catch-basin was installed about 6 feet, maybe 8 feet, from the old catch-basin. When the new catch-basin was installed there, the top was taken from the old one and put on the new one; then the old one was filled with dirt and stone and brickbats. I do not know of my own knowledge how that was filled. According to the rules and customs and requirements of our department, in refilling an excavation of that character in a public street, the material is put in the hole or trench in layers not exceeding a foot at a time and tamped, or else a mixture of dirt and water is put into the hole. In either case it will settle. * * * The conduit or pipe of the abandoned catch-basin should be plugged at the ends. If it is not, it may form a tunnel there that the dirt would gradually wash into and cause a settlement around its ends. I do not know of my own knowledge whether or not that was done on that occasion. (Here a photograph of the hole which caused Mrs. Peterson's fall was shown the witness, and he continued:) Assuming that the hole shown on the photograph shown me between the concrete sidewalk and the curbing next to the street on Louisiana existed at the corner of Bell avenue in the immediate vicinity of where the old catch-basin was, I do not know what caused that defect or hole. It might be caused from one of two reasons. It might be just the normal settlement that takes place when any hole is filled. We have never been able to fill a hole or a trench in the streets of Houston that won't settle afterwards. We have tried every scheme that has ever been thought of. It might be caused by the fact that that pipe leading from that—if it is an old catch-basin; I don't know that it is; I cannot identify these photographs—but if that is that old catch-basin, and the pipe leading from it were not properly plugged, water running into that hole could have washed out some of the dirt and caused that settlement.

"Assuming that that depression that I observe there was approximately from one foot to 14 or 18 inches deep, and 14 inches we will say in diameter in one direction, or irregular shape, and was hollowed out beneath the surface or crust of the earth in the direction towards the street, without knowing of my own knowledge how the hole was filled or the catchbasin in that neighborhood was filled, I don't think I could state whether that was due to normal conditions. I think that settlement might be caused by either of the causes I mentioned above. I don't think the shape or depth of the hole would indicate what caused the settlement.

"Tamping and ramming down dirt into the hole and plugging in a hole of that character would be done to minimize the settlement that will take place afterwards. If the excavation is in a street not to be immediately paved, our custom is to fill the trench with dirt and wet it down with water. Then we make a practice of going over it about once every three months for a year, and each time we find some settlement, sometimes we have to go back over it later than a year and find settlement. * * *

"Our office had an inspector there to supervise this work. * * * I have not dug in there (meaning the old catch-basin) to see what the cause of that depression is. The earth right at that corner is somewhat low. I never saw this hole until after it was filled, so I do not know how that particular hole was as to whether or not there is any slope there or whether it showed any sinking or settlement there with respect to the way it should be. I do not know when it was filled or by whom. * * *

"Where this hole was is where the old catchbasin was. That is where the top was taken off from the old hole. * * * In refilling that surface in the beginning, it ought not to be filled very much above, just a little above, the normal surface of the earth."

The witness J. A. Handy testified on the point as follows:

"I am connected with the Eureka Paving Company as superintendent of construction. I had something to do with the construction of the pavement on Louisiana street between Pease and Dallas, in Houston. That was in the year 1914, if I remember correctly. I was general superintendent of construction with them. I had something to do with the refilling of a catch-basin hole at the corner of Louisiana and Bell. That hole was filled with brickbats and earth filling and dirt, filled to the top and tamped, and then about 6 or 8 inches above the top, and left in very good condition.

"For the last 25 years I have been street paving and connected with sewer work. Sewer work always comes in connection with paving, particularly in Houston. In other cities it is made a part of the contract. In Houston it is generally with the contract to pave. From that experience I am able to tell when I see a job whether or not the filling of an old hole is carefully and properly filled. This particular hole was properly and carefully filled. I am familiar with the usual and customary manner of filling such holes in Houston and its vicinity. This hole was filled in accordance with the usual and customary manner and practice."

On cross-examination by the plaintiffs he further testified:

"I say I have been engaged in this business about 25 years. I had supervision of this particular work. At that particular place I actually saw the work done; I saw the work done at that particular catch-basin. The old catchbasin was located directly beyond the new one, or west of the new one; I don't know whether it was 6 feet or 8 feet, but it was on the northwest corner of Bell avenue, Louisiana avenue

and Bell, however they term those streets. * * * As to how large it was in circumference, I did not have any occasion to measure that catch-basin; I cannot estimate it. I suppose those things are about 3 feet across inside, probably larger, and probably smaller. It all depends on the amount of water at that particular point that they have got to carry. I have constructed a number of them. In paving a street and the proper drainage of it, it is necessary to have catch-basins if the city engineer requires it; it is not for the contractor to say whether it is necessary or not. I do not propose to be an engineer. That particular catch-basin was pretty much like any of the rest of them in Houston, built with a brick wall, 8-inch wall generally, 24 inches, maybe 36 inches, and maybe 4 feet, in diameter—I had no occasion to measure it—with a cast-iron cover on the top, the depth depending on the fall line of the sewer. That may have been 10 feet or it may have been 2 feet. I have no idea how deep it was or no recollection. It took probably a couple of hours to refill it. The work of refilling was done with laborers, men we had hired. I do not recall now who those laborers were. I cannot say that they are now in the employ of the company. We never take laborers with us to Oklahoma. I just supervised this work. I directed the removal of the top off of the catch-basin. That is a custom, to take the old basin and use it wherever possible, to omit buying new catch-basin covers. The excavation is then filled as I have explained. It has been filled. When the city is building storm sewers or laying new mains, it requires that a certain amount of dirt and material be put in and let in a certain amount of water, and tamp and trample it down and ram it down tight, and then put in another layer, and go through that process until it is filled, and then fill it a few inches above the level of the earth; but that is not required by the city when building new excavations. It is not customary or the proper way of filling a catch-basin. That has a brick wall or a concrete wall to retain it. It holds the dirt in. I don't know that there is a conduit at the bottom of that catch bottom that leads the water from the catch-basin that accumulates out into the sewer or manhole in the street. I know that there possibly may have been one there at the time. I did not direct any work to be done in connection with that pipe at that time. I did nothing in regard to that. Probably the object in filling this excavation in the manner I have described and trampling it down and getting it in tight is to make it safe for travel. The natural settling is taken care of by filling above the proper level of the old excavation, to allow for settling. Even with that it will ordinarily settle after a certain length of time, owning to either drouth or rain. It is a custom in building sewers to continue to observe the particular work for some little time afterward, in order to obviate a condition of unsafety arising. We do that, and we did that in this instance, because that sewer was built maybe a week or two, or month or two, before the pavement, and we were all on the job there, and naturally kept that basin in a safe condition. * * * After the completion of the work and acceptance by the city, I don't know that I went to that particular place to see if the thing had settled any, but we went over the street several times after it was accepted. I could not say right offhand how many times we went back. * * * I could not tell you whether that excavation was in a firm condition. It was there prior to the time I came to Houston. It was an old-time one. After the top was removed it left a hole there, and we filled the hole."

The witness Sands was recalled by the plaintiffs, and, among other things, testified as follows:

"As to whether before accepting this work I ascertained whether or not the old catch-basin had either been filled in or pricked up and put in such condition that this hole that I speak of would not occur or result, I don't think I paid much attention to the old catch-basin. I went over the work before I accepted it. I noticed they had moved that old top, taken that. I noticed that before I accepted it. There was no way to tell as to whether they had refilled the old catch-basin or bricked up the opening, because the ground was filled up to all appearances level, and I could not tell what they had done underneath the ground. While when I make those inspections I make a good many inquiries, I have no recollection of what I inquired at that time. Ordinarily, in the performance of my general duties, I don't believe I would make a special inquiry as to whether the catch-basin was bricked up; I would just assume that the pipe had been plugged up and had been filled; that is the customary way of doing that, and I assume that they had done this the same way. The old ditch that conveyed the water to the catch-basin had been refilled with dirt from the excavation of the street."

The witness Morris Beck testified for plaintiffs, and, among other things, stated, substantially, that he was foreman of the water department of the city of Houston at one time, and showed that he was familiar with the proper methods of filling excavations, etc., and he testified that he was in Houston at the time of Mrs. Peterson's injury, and upon her request, made a few days after the accident, he went to the place where she was injured to ascertain if he could what caused the hole into which she stepped to be there, and in this connection he stated:

"I found that same had been an old catch-basin that had been filled in, and the filling had settled, and left a hole there about 20 inches deep and about 18 inches in diameter. The hole had been filled with brickbats and dirt, and the dirt had washed through the brickbats, and had settled and left the hole there, on account of the dirt washing through the brickbats. The excavation was already there, and they made a new catch-basin."

There was testimony introduced to the effect that there were very excessive rainfalls in the fall and winter of 1914 and the spring and summer of 1915, as well as some very hard rains during 1916 and 1917.

Plaintiffs introduced in evidence section 4,

art. II, of the charter of the city of Houston showing complete and full power and authority of the city to establish streets and sidewalks and keep the same in proper repair, etc.

Section 12, art. 9, of the city charter of the city of Houston, which was introduced in evidence, and which was in effect at the time the injury to Mrs. Peterson occurred, provides, in substance, that the city shall not be liable to any person for damages caused from streets, ways, etc., being out of repair by reason of the city's negligence, when it is not shown that the city had ten days' special written notice of the defective condition thereof. It was admitted upon the trial that the notice required by the above article of the charter was not given the city.

We have shown above the specifications of negligence upon which plaintiffs relied for a recovery in this case. They were: (1) That the Eureka Paving Company failed to properly and skillfully plug and fill up the pipe or conduit leading from the abandoned excavation or catch-basin; (2) that said defendant failed to properly and skillfully fill in and cover up said excavation and catch-basin, in that it so failed and neglected to use proper materials or skilled labor and workmen; and (3) that said defendant negligently failed and neglected to fill up, tamp, pack, and ram down tight the earth or other materials with which said excavation and catch-basin was then and there filled and covered up.

We have above shown all the material evidence, as we conceive it to be, bearing upon these allegations of negligence, and we have concluded that as to the second and third grounds of negligence there is not the slightest evidence in this record supporting the same, and we dismiss those grounds without further discussion. This leaves for disposition only the point as to whether the evidence was sufficient to raise the issue of negligence as to whether the Eureka Paving Company failed to properly and skillfully plug and fill up the pipe or conduit leading from the abandoned catch-basin, and whether such negligence, if any, was the proximate cause of Mrs. Peterson's injury.

The substance of the evidence of the witness Sands above quoted, bearing on the issue of negligence as to the manner in which the old catch-basin was refilled or filled up and left, is that dirt, stone, and brickbats should have been used for such filling and properly tamped, so as to prevent, as far as possible, any sinking or settling below the surface, but he could not say on his own knowledge how this old catch-basin was filled. It is plain, however, from his evidence, that such filling, however made, will in time settle or sink beneath the surface, causing a depression where the hole was. Also, according to his testimony, the pipe or conduit leading from the bottom of the old catch-basin to the manhole in the street should have been plugged at the ends. If this were not done, it might result that dirt put into the old hole would, in time, gradually wash into this pipe or conduit, which might cause a sinking or depression in the mouth of the old hole. The witness could not say, however, whether or not said pipe or conduit was so plugged. It is plain, however, from his evidence, that the sink or depression into which Mrs. Peterson stepped might have resulted from other and normal causes, such as the natural settling of the material in the hole and the effect of rain and storm, whether such pipe or conduit was plugged or not. It is plain from the evidence of this witness that the city has never been able to devise any system or scheme that would absolutely prevent such depressions, however careful in the selection of material and the work of filling such holes.

According to the evidence of the witness Handy, the old catch-basin was refilled or filled up with the very material the witness Sands stated was proper for such purpose, and such filling was carefully and properly done, and the hole was raised some six or eight inches above the surface of the ground with a view to allowing for the natural and normal settling or sinking that would take place. It was shown by this witness that he had had approximately 25 years' experience in doing such work, and that he knew the proper manner and method to be pursued and the materials to be used in such work, and that he properly and carefully filled this old catch-basin. As to whether the ends of the conduit or pipe at the bottom of the basin were plugged, as plaintiffs alleged should have been done, this witness was unable to say. He did not himself do the work of actually refilling this old catch-basin, but supervised the work, and stated that it took them probably two hours to properly fill in this hole, but that as to whether the ends of the pipe or conduit were plugged he did not remember, and could not say.

[1] According to the evidence of the witness Beck, who examined this hole or sink into which Mrs. Peterson stepped a few days after the injury, the witness, on examination at the top of the hole, found that the same had been filled with brick and dirt, and it was his opinion that the sink or depression there was the result of rain washing the dirt down through the brick, and thereby causing the sinking or settling beneath the surface. The evidence of these three witnesses, Sands, Handy, and Beck, as we have stated it, was all the material evidence bearing upon any issue of negligence relied upon by the plaintiffs in this case, and we have concluded, after careful consideration of it

all, that it failed to raise an issue for the consideration of the jury as to whether the manner. in which this old catch-basin was refilled and the condition in which the work was completed and left constituted negligence proximately causing Mrs. Peterson's injury. The burden of proof of negligence in this case as the proximate cause of Mrs. Peterson's injury rested upon plaintiffs, and, before they were entitled to a submission of the case to the jury, it was incumbent upon them to establish by evidence with reasonable certainty that defendants were guilty of negligence in one or more particulars alleged by them. As we have already said, it could not be reasonably contended from the evidence that proper material was not used in refilling the old catch-basin, nor could it be reasonably contended that properly skilled labor and workmen were not used, nor could it be reasonably contended that the defendants failed to properly tamp and pack the material with which the catch-basin was filled. Now was the evidence, as we have detailed it, sufficient to show with reasonable certainty that the ends of the pipe or conduit leading from the bottom of the catch-basin were not plugged, as plaintiffs contend they should have been? No witness has said that such pipe was not so plugged. It is true the witness Sands testified substantially that a failure to plug such pipe could cause the earth used in the filling of the basin to be gradually washed by rain and storm water into this pipe or conduit, and thereby eventually cause the sinking or depression at the top of the basin, and that a failure to so plug the pipe might probably do this, but it is also plain from his evidence that it is equally probable that the depression or sink at the top might have resulted from normal causes, · as explained by him, whether the' pipe was plugged or not. The evidence of the witness Beck to the effect that the sink or depression was caused by dirt being washed through the brick at the top of the hole does not materially strengthen the contention of the plaintiffs that this was caused by a failure to plug the pipe at the bottom. His evidence on that point is entirely consistent with the evidence of the witness Sands to the effect that such depression would probably follow, regardless of whether the hole was plugged or not.

[2, 3] We have concluded that the evidence as a whole, at the most, raises only a surmise or suspicion that the failure to plug the pipe at the bottom might have been the cause of the sink or depression 'at the top of this old abandoned catch-basin, but, even if it could be said that the evidence as a whole was reasonably sufficient to carry the case to the jury as to whether the pipe or conduit was plugged, and that the failure to so plug the pipe was negligence, still we are of the opinion that such negligence would not be the proximate cause of Mrs. Peterson's injury, and on this point, as sustaining their contention, the defendants rely upon the case of City of Houston v. Vatter, 32 Tex. Civ. App. 298, 74 S. W. 806. The opinion in that case was by the Galveston Court of Civil Appeals, and a writ of error was applied for, but was refused by the Supreme Court of this state. It is the contention of plaintiffs (appellants here) that the Vatter Case is not in point, but they contend that the case of City of Dallas v. Jones, 93 Tex. 46, 49 S. W. 577, 53 S. W. 377, and other Texas cases cited by them, are more nearly relevant to the question here, and are decisive in their favor. We have read carefully all authorities cited by appellants, and, without discussing them, we have concluded that they are all distinguishable from the case at bar, and, further, we are unable to see and in our opinion appellants' able and energetic counsel has failed to show, any substantial distinction upon the facts between the Vatter Case and the case at bar, and since the decision in the Vatter Case has the force and effect of a holding by the Supreme Court of this state, and since we are unable to find where its soundness has ever been questioned or the holding in the least modified by the Supreme Court of this state, it is the duty of this court, even if we had any doubt of the soundness of the decision, which we have not, to follow it.

Our conclusion therefore is that no issue of actionable negligence, as alleged by the plaintiffs, was sufficiently supported by evidence to warrant the trial court in submitting the case to the jury, and that the trial court correctly declined to do so.

[4] The fact that the trial court, upon motion of defendants, discharged the jury in the case and rendered judgment for defendants, without a verdict of the jury, was no more, in effect, under the practice in this state, than to have instructed a verdict in favor of defendants, which would have been proper, and therefore no error prejudicial to appellants was committed by this action of the trial court.

The judgment should be affirmed, and it will be so ordered.